IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| SEA TOW PORTLAND/VANCOUVER, an Oregon assumed business name, | ) ) ) | |
| Plaintiff, | ) ) | No. CV-06-985-HU |
| v. | ) ) | |
| Yacht HIGH STEAKS, a 65-foot Marquis motor vessel, its engines, equipment, furnishings and tackle, in rem, | ) ) ) ) ) | FINDINGS OF FACT & CONCLUSIONS OF LAW |
| Defendant. | ) ) | |

Robert I. Sanders
Todd A. Zilbert
WOOD TATUM
6915 S.W. Macadam Avenue, Suite 115
Portland, Oregon 97219

    Attorneys for Plaintiff

Rodney Q. Fonda
COZEN O'CONNOR
1201 Third Avenue
Seattle, Washington 98101-3071

    Attorney for Defendant

HUBEL, Magistrate Judge:

    In this admiralty action, plaintiff Sea Tow Portland/Vancouver brings a claim for salvage against defendant HIGH STEAKS, arising

1 -  FINDINGS OF FACT & CONCLUSIONS OF LAW

out of a marina fire in January 2006. The parties have consented to entry of final judgment by a Magistrate Judge in accordance with Federal Rule of Civil Procedure 73 and 28 U.S.C. § 636(c). I conducted a two-day court trial on October 2 and 3, 2007. This Opinion constitutes my Findings of Fact and Conclusions of Law. Fed. R. Civ. P. 52(a). For the reasons explained herein, I award plaintiff $3,000, plus pre-judgment interest at a rate of 4.5%.

I. Agreed Facts

In the Pretrial Order, the parties agreed to the following facts:

Plaintiff Sea Tow Portland/Vancouver is an Oregon assumed business name owned by Graddon Associates LLC. At material times, Sea Tow was in the business of providing salvage and contract towage to vessels in distress in the Columbia and Willamette Rivers, on the Oregon coast, and in other waters of the Pacific Northwest. Sea Tow maintains specialized equipment, including response vessels, for this purpose.

Defendant HIGH STEAKS is a 65-foot Marquis motor yacht built in 2005 by Carver Boat Corporation LLC, and owned at all material times by Carl Walther, a resident of Vancouver, Washington. The fair market value of the HIGH STEAKS, its engines, equipment, furnishings and tackle on January 25, 2006, was $2,160,000. Damage caused by a fire and smoke, discussed below, was repaired for slightly more than $14,000. Thus, the value of the vessel at the conclusion of events at issue was $2,146,000.

At about 6:25 a.m. on January 25, 2006, a fire was discovered in a boathouse in Row D at the Columbia River Yacht Club moorage at 37 NE Tomahawk Island Drive in Portland, on Hayden Island, in the

Columbia River. The fire, which generated 20-foot high flames, explosions, and billows of black smoke, consumed the boathouse in which the fire began, the vessel inside that boathouse, two adjacent boathouses, and the two vessels in the adjacent boathouses.

The yacht HIGH STEAKS was moored in its boathouse, which was located two houses east of the boathouse in which the fire began, also in Row D. The fire spread from the boathouse where it started to the adjoining boathouses and then to the side of the boathouse in which the HIGH STEAKS was moored.

Captain Lyman Louis of Sea Tow Portland/Vancouver learned about the fire at the Columbia River Yacht Club moorage from a television news broadcast. Captain Louis immediately took the Sea Tow vessel DENNIS D. to the Columbia River Yacht Club moorage. Captain Louis and Sea Tow Portland/Vancouver were under no legal or contractual obligation to respond to the fire and the peril to the vessels at the Yacht Club moorage.

Port of Portland boat RESCUE BOAT 860 was in the vicinity of the HIGH STEAKS boathouse when the DENNIS D. arrived at the Yacht Club moorage. RESCUE BOAT 860 assisted the HIGH STEAKS out of its boathouse by towing HIGH STEAKS. HIGH STEAKS was not under power while in tow by the RESCUE BOAT 860.

Lieutenant Tyler Lyons of the Port of Portland was on RESCUE BOAT 860 and told Captain Louis on the Sea Tow vessel DENNIS D. to move HIGH STEAKS. A firefighter from the Portland Fire Bureau was on the bow of the HIGH STEAKS when Lieutenant Lyons communicated to Captain Louis.

After Lieutenant Lyons communicated to Captain Louis, RESCUE

3 - FINDINGS OF FACT & CONCLUSIONS OF LAW

BOAT 860 disengaged from the HIGH STEAKS and Captain Louis on the DENNIS D. took control of the HIGH STEAKS. John Walther, a cousin of HIGH STEAKS owner Carl Walther, boarded HIGH STEAKS while it was within the Columbia River Yacht Club moorage about the time Captain Louis took control of the HIGH STEAKS. Captain Louis suggested, and John Walther agreed, that the Sea Tow vessel DENNIS D. would move the HIGH STEAKS into the Columbia River adjacent to the Columbia River Yacht Club moorage before John Walther took control of the HIGH STEAKS.

After the Sea Tow vessel DENNIS D. moved the HIGH STEAKS into the Columbia River adjacent to the Columbia River Yacht Club moorage, John Walther started the engines and took control of the HIGH STEAKS. After John Walther took control of the HIGH STEAKS, he navigated the HIGH STEAKS directly to a berth at Sundance Yacht Sales & Moorage on Hayden Island, and did not return the HIGH STEAKS to the Columbia River Yacht Club moorage.

As the Sea Tow vessel DENNIS D. moved the HIGH STEAKS from the Columbia River Yacht Club moorage, Portland Fireboat 17 passed the DENNIS D. and the HIGH STEAKS in the vicinity of the Columbia River Yacht Club fuel dock, approaching the scene of the fire. Portland Fireboat 17 and Fireboat 6 conducted fire suppression operations in the Columbia River Yacht Club moorage after the Sea Tow vessel DENNIS D. moved the HIGH STEAKS from the Columbia River Yacht Club moorage.

II. Law of Salvage

> Salvage is the compensation allowed to persons by whose assistance a ship or her cargo has been saved, in whole or in part, from impending peril on the sea, or in recovering such property from actual loss, as in the cases of shipwreck, derelict, or recapture. . . . More

4 -   FINDINGS OF FACT & CONCLUSIONS OF LAW

> than one set of salvors . . . may contribute to the result, and in such cases all who engaged in the enterprise and materially contributed to the saving of the property, are entitled to share in the reward which the law allows for such meritorious service, and in proportion to the nature, duration, risk, and value of the service rendered.

The Blackwall, 77 U.S. 1, 12 (1870).

The elements of a claim for salvage are: (1) a maritime peril from which the ship or other property could not have been rescued without the salvor's assistance; (2) a voluntary act by the salvor; that is, he must be under no official or legal duty to render the assistance; and (3) the act must be successful in saving, or in helping to save, at least a part of the property at risk. U.S. Dominator, Inc. v. Factory Ship ROBERT E. RESOFF, 768 F.2d 1099, 1104 (9th Cir. 1985) superseded by statute on other grounds, Simpson v. Lear Astronics Corp., 77 F.3d 1170 (9th Cir. 1996).

The parties agree that the second and third factors are not at issue in this case. The decisive issue is whether there was a marine peril at the time the DENNIS D. took control of the HIGH STEAKS.

A marine peril "exists when a vessel is exposed to any actual or apprehended danger which might result in her destruction." Evanow v. M/V NEPTUNE, 163 F.3d 1108, 1114 (9th Cir. 1998) (internal quotation omitted). "Whether a marine peril exists is a question of fact[.]" Id.

III. Discussion

A. Salvage - Marine Peril

Based on the agreed facts and the testimony at trial, it is undisputed that the HIGH STEAKS was in peril while in its boathouse. Clearly, at that point, it was exposed to actual danger

5 - FINDINGS OF FACT & CONCLUSIONS OF LAW

which could easily have resulted in her destruction.

At the time of the fire, Ken Edwards was one of the deckhands on RESCUE BOAT 860. During his testimony, Edwards explained the common firefighting terms "heat" or "hot" zone, "safety area" or "warm" zone, and "safe zone" or "cold" zone. The center of a fire and its immediate vicinity are in the "heat" or "hot" zone. As one proceeds away from a fire, one enters the "warm" zone or "safety area," and if one continues to move away from a fire, one eventually enters the "safe zone," or "cold" zone. The particular circumstances of each fire dictate where each of those zones begins and ends.

During the time Portland firefighter Timothy Von Seggern was maneuvering the HIGH STEAKS out of the boathouse, it remained in the hot zone and in peril. At some point while the HIGH STEAKS was coming out of its boathouse and during the initial time it was towed by RESCUE BOAT 860, it moved from the hot zone to the "safety area" or "warm zone." At this time, the vessel was still in peril.

As the firefighter witnesses explained, the boat was not under its own power because Von Seggern was unable to find the keys to the engine. Although he was able to operate the electric thruster and control, to some extent, port and starboard movement, the video (Pltf's Exh. 1; Deft's Exh. 501), confirmed by Von Seggern's testimony, shows that wind generated by the fire was drawing the boat toward the fire as it emerged from the boathouse, creating a risk of actual danger capable of destroying the yacht.

Even after the HIGH STEAKS was being towed by RESCUE BOAT 860, it remained in peril while in the warm or safety zone because the HIGH STEAKS was still subject to a wind trying to draw it toward

6 -   FINDINGS OF FACT & CONCLUSIONS OF LAW

the fire, and because the fire, and its associated explosions, was unpredictable. Additionally, Edwards and Lyons, the officer in charge of RESCUE BOAT 860 during the operation, testified that the HIGH STEAKS was approximately twice the length of the boats RESCUE BOAT 860 typically towed, and neither Edwards, nor Lyons had ever towed a vessel as large as the HIGH STEAKS, at least with RESCUE BOAT 860. Thus, at least until it was clear that RESCUE BOAT 860 was smoothly towing the HIGH STEAKS, actual or apprehended danger remained. Additionally, the HIGH STEAKS was still unable to move under its own power.

Exhibit 33 is a still photograph taken from the video, and shows RESCUE BOAT 860 towing the HIGH STEAKS. The HIGH STEAKS is well out of its boathouse and is heading northeast, away from the fire. RESCUE BOAT 860 is east of the last boathouse on Row C of the Columbia River Yacht Club. The bow of RESCUE BOAT 860 is pointed roughly north, and the vessel is parallel to the boathouses on Row C which run north and south. Exh. 33.

A line from the stern of RESCUE BOAT 860 is attached to the bow of the HIGH STEAKS. According to Edwards's testimony, the southern edge of the boathouses on Row C was approximately the outer boundary of the "safety zone," or "warm zone." Continuing that line east toward RESCUE BOAT 860 and the HIGH STEAKS as seen in Exhibit 33, that edge occurs somewhere along the tow line between the two vessels or across the bow of the HIGH STEAKS. Thus, at the time shown in Exhibit 33, RESCUE BOAT 860 is now in the cold, or safe zone, and the HIGH STEAKS is approaching that zone or beginning to cross into it. Most or all of the HIGH STEAKS remains in the safety zone or warm zone.

Von Seggern's efforts commenced the salvage. The salvage continued during the time it was towed by RESCUE BOAT 860. The salvage, once begun, continues until the salvaged vessel reaches a place of safety, which means a place where it is no longer in actual or apprehended danger. E.g., The Jefferson, 215 U.S. 130, 140-41 (1909) (noting that in an earlier English case, salvage was awarded for towing to a "place of safety" a vessel lying in a dock and in danger of catching fire from the surrounding warehouses which were in flames); Columbus-American Discovery Group v. Atlantic Mut. Ins. Co., 56 F.3d 556, 571 (4th Cir. 1995) ("'The prototypical act [of salvage] is rescuing a ship in peril at sea and towing her to a place of safety'") (quoting Gilmore & Black, The Law of Admiralty, § 8-2, at 536-37 (2d ed. 1975)).

Importantly, actual danger of destruction is not required to establish a peril sufficient to sustain a salvage claim. E.g., Evanow, 163 F.3d at 1114 (a maritime peril exists when vessel is exposed to actual or apprehended danger). As the Southern District of Florida explained in a 1995 case, "the danger need not be immediate or actual. . . . All that is necessary is a reasonable apprehension of peril." Fine v. Rockwood, 895 F. Supp. 306, 309 (S.D. Fla. 1995) (citation omitted).

The Fine court noted that over time, courts have found marine peril where the vessel lacked motive power or where explosions were likely. Id. The court further noted that salvage service includes towage, fire fighting, standing by, securing aid, giving advice, pilotage, and more. Id. at 310.

Even though it appears that the DENNIS D. took over towing the HIGH STEAKS after the HIGH STEAKS was in the safe or cold zone, the

8 - FINDINGS OF FACT & CONCLUSIONS OF LAW

HIGH STEAKS was still in peril at that time. Although the danger was greatly reduced by virtue of the HIGH STEAKS having moved farther away from the fire, the HIGH STEAKS was still not under its own power, and the fire was still raging, creating uncertainty as to possible additional explosions or spread from Row D. Embers were also flying through the air, landing on Row C.

While it is likely that if HIGH STEAKS had drifted west toward the fire at the time HIGH STEAKS hooked up to the DENNIS D., it would have come up against the east end of Row C and would not have drifted all the way back to the fire, there still remained a reasonable apprehension of danger which might have caused the vessel's destruction. Thus, at the time the DENNIS D. began its tow, a peril still existed and the salvage continued.

The undisputed testimony of all witnesses was that the yacht club's fuel dock was a place of safety. Captain Louis's testimony was that it was not reasonably feasible to take the HIGH STEAKS to the fuel dock or the yacht club's Row A and thus, he took the vessel out to the Columbia River. The appropriate "place of safety" was at least the fuel dock and was no farther than the Columbia River when the HIGH STEAKS got her engines running. Because of the extremely short lapse of time between when the DENNIS D. began towing the HIGH STEAKS and when the HIGH STEAKS was under her own power, and because of the absence of any peril between these two points (that is, they were both in a "place of safety"), there is no meaningful reason to distinguish between the two of them for the purposes of determining whether there was or was not a salvage. While the danger might have been diminished from its peak, the evidence establishes that there was a peril at

9 - FINDINGS OF FACT & CONCLUSIONS OF LAW

the time DENNIS D. became involved and that it continued for a short time to at least the fuel dock.

C. Salvage - Award

The Blackwall recites six factors to consider in setting the amount of a salvage award: (1) the labor of the salvors; (2) their promptitude, skill, and energy; (3) the value of the property employed by the salvors and the danger to it; (4) the risk incurred by salvors; (5) the value of the property saved; and (6) the degree of danger from which the property was rescued. 77 U.S. at 13-14; see also U.S. Dominator, 768 F.2d at 1104-05 (noting that The Blackwall sets forth the "classic formulation of the factors to be considered in assessing a salvage award").

In The Blackwall, the Court explained that "[c]ompensation as salvage is not viewed by the admiralty courts merely as pay, on the principle of a *quantum meruit*, or as a remuneration *pro opere et labore*, but as a reward given for perilous services, voluntarily rendered, and as an inducement to seamen and others to embark in such undertakings to save life and property." Id. at 14.

1. Labor of the Salvor

In this case, the labor expended by plaintiff was minimal. The DENNIS D. was on the scene for approximately thirty-five minutes. There was a short time spent getting from the DENNIS D.'s dock to the Columbia River Yacht Club and returning after the DENNIS D.'s services concluded. While on the scene, the DENNIS D. was on standby for much of the time, then passed a line to the HIGH STEAKS, waited for the person on the HIGH STEAKS to secure the line, and proceeded to tow the HIGH STEAKS away from the fire and then out to the Columbia River.

10 - FINDINGS OF FACT & CONCLUSIONS OF LAW

### 2. The Salvor's Promptitude, Skill, and Energy

The DENNIS D. arrived on the scene quickly. Some skill was required to maneuver the large HIGH STEAKS yacht out of the marina area. However, it could be argued that the DENNIS D. overshot the fuel dock, the closest place of safety. The DENNIS D. and Captain Louis expended relatively little energy on the salvage operation.

### 3. Value of Salvor's Property and Danger to It

Exhibit 31, an itemized valuation of the DENNIS D. and its equipment, shows a total value of $105,930. This salvage operation created minimal danger to the DENNIS D. The vessel was designed for this type of work. Other than the fire, it was not a high risk location because it was inside the marina, not out on open seas. While dark, it was not raining. The testimony established that the salvor encountered no significant problems.

### 4. Risk Incurred by Salvors

There was minimal risk to the DENNIS D. and Captain Louis in performing this salvage. All of the evidence establishes that the operation involved nothing more than plaintiff's everyday work.

### 5. Value of the Property Saved

As noted above, the parties agree that the value of the HIGH STEAKS at the time of salvage was $2,146,000.

### 6. Degree of Danger from which Property was Rescued

Although I conclude that the HIGH STEAKS was in peril at the time the DENNIS D. began the tow, the evidence establishes that the degree of danger to the HIGH STEAKS was minimal at that time. As discussed above, at the time this salvor rendered aid, the HIGH STEAKS was entering the safety or cold zone. While there remained some risk to the HIGH STEAKS because the fire was not yet under

11 - FINDINGS OF FACT & CONCLUSIONS OF LAW

control and the HIGH STEAKS was not yet under its own power, the actual danger was quite small. An apprehension of danger was reasonable, but the danger remained minimal. The DENNIS D. quickly towed the HIGH STEAKS toward the fuel dock and the passage to this initial place of safety occurred very quickly. Thus, while the facts support a determination that plaintiff performed a salvage, the danger to which the HIGH STEAKS was exposed during this salvor's completion of the salvage, was minimal.

Based on these factors, I reject plaintiff's request that the salvage award be measured as a percentage of the value of the HIGH STEAKS. As the preceding discussion makes clear, in this case, plaintiff's suggested award of $236,060, based on 10% of the yacht value plus a 1% "uplift" in recognition of plaintiff's status as a professional salvor, is out of proportion to the services rendered and the dangers encountered.

On other hand, I view defendant's suggestion of a $600 award as too small and inappropriately based only on a quantum meruit theory. Defendant's proposed award is based on a calculation of plaintiff's maximum per hour charge of $300, multiplied by two hours. The cases make clear that a salvor's award should not be measured by quantum meruit. E.g., U.S. Dominator, 768 F.2d at 1106 ("Moreover, a quantum meruit approach is inappropriate because a salvage award is intended as a reward for perilous services voluntarily rendered.") (internal quotation omitted).

My analysis of the relevant factors leads me to conclude that $3,000 is the appropriate salvage award in this case. I note that this is five times the quantum meruit award suggested by defendant. Fundamentally, I conclude that this award is appropriate and

12 - FINDINGS OF FACT & CONCLUSIONS OF LAW

generous given the minimal risk to plaintiff, the minimal labor expended by plaintiff, the exercise of some skill, and most importantly, the fact that the degree of danger from which the HIGH STEAKS was rescued by this salvor was minimal. Moreover, I reject plaintiff's request for an enhancement based on its status as a professional salvor.[1]

Finally, plaintiff seeks pre-judgment interest at a rate of 10.5%. District of Oregon Local Rule 1055 provides that, unless otherwise ordered by the Court, pre-judgment interest in admiralty cases is calculated using the method given in 28 U.S.C. § 1961, used for post-judgment interest. Under section 1961, the rate is the weekly average one-year constant maturity Treasury yield, compounded annually. 28 U.S.C. § 1961(a). Plaintiff reports, and defendant does not dispute, that for the week ending January 27, 2006, the rate was 4.5%.

Plaintiff argues, however, for a higher interest rate. I reject this argument. First, the two Ninth Circuit cases cited by plaintiff are not on point. In In re Exxon Valdez, 484 F.3d 1098 (9th Cir. 2007), the plaintiff sought damages under state law for business losses resulting from a large oil spill. The parties settled the case except for the issue of pre-judgment interest.

---

[1] Additionally, during the trial, I denied plaintiff's motion to admit Exhibits 12-19, showing the use of certain pollution control efforts and devices, because there was no evidence that the DENNIS D. was involved in this part of the incident and because there was no evidence showing that the DENNIS D. was at any risk because of any pollution. Accordingly, even if I accepted plaintiff's argument that the presence of an environmental hazard is a factor to consider in making a salvage award, I reject it in this case as irrelevant.

13 - FINDINGS OF FACT & CONCLUSIONS OF LAW

The district court held that federal law applied to pre-judgment interest rates.

The Ninth Circuit explained that because pre-judgment interest was a substantive aspect of the plaintiff's claim, state law applied to the pre-judgment interest claim unless federal law preempted it. Id. at 1101. The court then held that the state law pre-judgment interest claim was not preempted by federal admiralty law. Id. at 1101-02.

The problem for plaintiff here is that plaintiff has a federal admiralty claim, not a state law claim. Exxon Valdez is distinguishable.

Next, in Western Pacific Fisheries, Inc. v. S.S. PRESIDENT GRANT, 730 F.2d 1280, 1288 (9th Cir. 1984), the district court awarded pre-judgment interest at a rate of 8%. The appellate court does not indicate how the district court arrived at the 8% rate. Post-judgment interest, which was also awarded, was assessed at a 9.29% rate in accordance with 28 U.S.C. § 1961. Interest rates in the early 1980s were higher than at any time since then.

The plaintiff argued that the 8% pre-judgment interest rate was inadequate. The Ninth Circuit explained that in 1982, Congress amended section 1961 so that post-judgment interest was calculated by referring to the one-year Treasury bill rates. Id. at 1289. The court explained that this amendment was intended to remove economic incentives to delay prompt litigation caused by judicially-awarded interest rates less than the contemporary cost of money. Id. Thus, the court concluded that although section 1961 did not provide for pre-judgment interest, it was "entirely compatible with awards of such interest," and the measure in

14 -   FINDINGS OF FACT & CONCLUSIONS OF LAW

section 1961(a) for post-judgment interest was also appropriate for fixing the rate for pre-judgment interest. Id.

Western Pacific Fisheries indicates that section 1961 is an entirely appropriate basis for calculating an award of pre-judgment interest. While the plaintiff in Western Pacific Fisheries received a higher interest rate as a result of the Ninth Circuit's conclusion, the case does not suggest that in the ordinary case, a higher rate of interest is more equitable.

Second, plaintiff also cites a Fifth Circuit case for the proposition that an appropriate measure of pre-judgment interest is the claimant's actual cost of borrowing money. United States v. Central Gulf Lines, Inc., 974 F.2d 621, 630 (5th Cir. 1992). While the case suggests that a court may, within its discretion, examine the cost of borrowing money, the Fifth Circuit rejected such a rate absent evidence that the plaintiff had actually borrowed money and incurred the higher costs. Id.

Here, the only evidence on this issue was that plaintiff maintains a line of credit with American Express that it uses for "cash flow." Testimony of Capt. Deborah Horan. Plaintiff borrowed no money for anything related to the HIGH STEAKS. In this circumstance, a higher rate is unwarranted. Pre-judgment interest is allowed from the date of the salvage, January 25, 2006, to the date of judgment, at a rate of 4.5%.

/ / /
/ / /
/ / /
/ / /
/ / /

15 - FINDINGS OF FACT & CONCLUSIONS OF LAW

## CONCLUSION

Plaintiff performed a salvage. Plaintiff is awarded $3,000 as a salvage award, with pre-judgment interest from January 25, 2006, to the date of judgment, at a rate of 4.5%.

IT IS SO ORDERED.

Dated this  12th  day of   October  , 2007.

/s/ Dennis James Hubel
Dennis James Hubel
United States Magistrate Judge

16 - FINDINGS OF FACT & CONCLUSIONS OF LAW